IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| WELLS FARGO BANK, N.A., Trustee of the MILTON LEVY 2006-1 INSURANCE TRUST, a Texas common law Trust,<br><br>Plaintiff,<br><br>vs.<br><br>PHL VARIABLE INSURANCE COMPANY,<br><br>Defendant. | § § § § § § § § § § § § | CASE NO. 3:12-CV-3760<br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT

Plaintiff the Milton Levy 2006-1 Insurance Trust (the "Levy Trust"), through Wells Fargo Bank, N.A. ("Wells Fargo"), as its trustee complains of Defendant PHL Variable Insurance Company ("Phoenix" or "Defendant"), as follows:

## NATURE OF ACTION

1.      This is an action for breach of contract, declaratory judgment, breach of the duty of good faith, and violation of the Texas Insurance Code's requirements regarding the prompt payment of insurance claims, arising from Defendant Phoenix's failure to pay the Levy Trust the $5,000,000 death benefit owed by Phoenix under a life insurance policy Phoenix issued to the Levy Trust on the life of Milton Levy (the "Policy").

2.      Phoenix was notified of Mr. Levy's death on June 7, 2012 and received Mr. Levy's death certificate on June 20, 2012.  The Policy promises that Phoenix will pay the death benefit to the Policy's beneficiary within two months of receiving proof of the insured's death, meaning that Phoenix was obligated to pay the Levy Trust the death benefit by August 20, at the

latest.  Nevertheless, Phoenix has not paid the $5,000,000 death benefit owed under the Policy, and instead has taken actions demonstrating that, absent litigation, it will not make such payment.  Thus, the Levy Trust seeks a declaration that Phoenix is obligated to pay the $5,000,000 death benefit to the Levy Trust and damages based on Phoenix's breach of the Policy.

3.     Phoenix's actions with respect to the Levy Trust's claim also constitute a violation of the Texas Insurance Code.  Phoenix's failure to pay the death benefit to the Levy Trust, and its misconduct in the claims process, did not arise from simple negligence but instead has been done without a reasonable basis, in bad faith, and part of a larger pattern of misconduct by Phoenix.  Indeed, on information and belief, Phoenix had decided long before Mr. Levy died that it would not honor the Policy but rather claim that the Policy was so-called investor-originated life insurance ("IOLI") and lacked an insurable interest.  Phoenix's claim investigation has been a pure pretext, as its actions discussed below demonstrate.  In so doing, Phoenix violated the duty of good faith that it owed to the Levy Trust.

4.     Despite the fact that the Texas Insurance Code requires insurers to immediately commence a claim investigation upon being notified of a claim and to provide any required claim forms to the policyholder within 15 days of being notified of the claim, Phoenix delayed over a month before requesting the completion of forms by the Levy Trust and purporting to begin its claim review.  This delay was particularly egregious given the fact that the Levy Trust requested on numerous occasions during the period of the delay that it be provided a claim form so that the benefits under the Policy could promptly be paid.  Phoenix's representatives engaged in this conduct in bad faith and knowing full well that Phoenix had no intention of paying the Levy Trust's claim.   They engaged in this delay so that Phoenix would not have to immediately litigate but could instead provide its lawyers with time to prepare a litigation strategy.  Due to Phoenix's violation of Chapter 542 of the Texas Insurance Code, by failing to provide the Levy

Trust with all required claim forms within 15 days, the Levy Trust is entitled to statutory interest on the $5,000,000 owed under the Policy at the rate of 18 percent per annum, as well as attorneys' fees.

5.    When Phoenix finally and belatedly responded to the Levy Trust's repeated inquiries, Phoenix demanded that the Levy Trust complete a "Certification And Acknowledgement of Trust Agreement," (the "Trust Certification") which is not required by the Policy.  The Trust Certification demands information regarding who the current beneficiary of the Levy Trust is and whether and when any transfers of interests in the Levy Trust have occurred.  By insisting that the Levy Trust provide information not required under the Policy, rather than paying the Levy Trust's claim upon proof of Mr. Levy's death, as the Policy states Phoenix will do, Phoenix has breached the Policy and acted in bad faith.

6.    Phoenix has no reasonable or legitimate reason for requiring the Levy Trust to provide information regarding its beneficiary.  Phoenix's purported basis for requiring the completion of the Trust Certification is that the information required by the form will help it determine whether or not the Policy is IOLI and thus, according to Phoenix, whether the Policy is supported by a valid insurable interest.  But Phoenix's purported justification for requiring the Levy Trust to complete the Trust Certification is meritless for two important reasons (aside from not being required by the Policy).

7.    First, under longstanding Texas law, Phoenix cannot refuse to pay a death claim based on a purported lack of insurable interest.  *See, e.g., Cheeves v. Anders*, 87 Tex. 287, 292 (1894); *Tamez v. Certain Underwriters at Lloyd's London*, 999 S.W.2d 12, 15 (Tex. App.— Houston [14th Dist.] 1998, pet. denied).  Second, under Texas law, an insurable interest exists as long as the insured consented to the purchase of the Policy.  *See* Sections 1103.054 and 1103.056 of the Texas Insurance Code.  Here, Phoenix knows that Mr. Levy consented as he signed the

application submitted to Phoenix.  Because Phoenix is not permitted to challenge insurable

interest, and because the Policy plainly complies with Texas' insurable interest law, Phoenix has

no reasonable reason to refuse to pay the death benefit to the Levy Trust and has breached its

duty of good faith to the Levy Trust by not promptly paying its claim.

8.     Phoenix's purported concern about the Policy being IOLI or lacking an insurable

interest is not only factually incorrect and irrelevant, as described above, but it is contradicted by

Phoenix's own actions.   Initially, Phoenix fully embraced the sale of policies to investors (the

"secondary market" for policies), which it now criticizes and uses as a pretext for attempting to

rescind policies.  For years, Phoenix issued policies it knew were going to be owned by investors

in order to boost its short term profits and actively encouraged its agents to seek out such

business.  Phoenix's parent company also became an active buyer of policies on the secondary

market and even formed a subsidiary dedicated to the purchase of policies on the secondary

market.  Phoenix was thus an active, willing, and aggressive participant in the secondary market

for years.

9.     One former employee has candidly admitted that: (i) as much as 80% of

Phoenix's business was what Phoenix now denounces as IOLI; (ii) Phoenix's managers

encouraged the solicitation of such business and taught employees how to find such business;

and (iii) Phoenix's CEO would have had to have had a "learning disability" to not know that

IOLI had become Phoenix's core business.  Another former employee has admitted that: (i) his

compensation rose from $75,000 in 2004 to $1.8 million in 2006 as a result of the sale of policies

Phoenix now denounces as IOLI; (ii) he generated as much premium revenue as some entire life

insurance companies due to the sale of such policies; (iii) Phoenix implemented sales quotas

which were impossible to meet without selling such policies; and (iv) it "doesn't take a rocket

scientist to figure out what was happening" in Phoenix's life insurance operations.  Phoenix

succeeded in becoming a primary seller in the lucrative and burgeoning secondary market.

10.     Now, however, due to its own dire financial situation, and its concern that it will be unable to meet its contractual obligations as they become due and survive as a company, Phoenix has reversed its position regarding the secondary market, which it previously embraced, routinely denying coverage under policies or seeking to rescind policies owned by investors on the pretextual ground that the policies it knowingly sold violate applicable insurable interest laws.  Phoenix has engaged in this practice not because of any legitimate concern regarding the policies, which it happily sold, but because it has found itself in significant financial trouble due to its involvement in substantial and reckless investments.  As a consequence of these problems of its own creation, Phoenix has been under intense pressure to expunge unprofitable, large face amount insurance policies from its books and to avoid paying claims on such policies.

11.     As a result of its financial trouble, Phoenix has begun to "wage war" on investors who own Phoenix policies in an attempt to intimidate them into lapsing their policies (so that Phoenix can reap a windfall) or convince them to accept less than the full benefits promised by Phoenix in its policies.  As part of its attacks on investors, and as a result of its own financial troubles, Phoenix has begun to engage in a deceptive practice, sometimes called "post-issuance underwriting", with respect to policies it no longer views as profitable.  In other words, when it is actually called upon to pay a death benefit by a third party owner, Phoenix purports to "rescind" the policies unilaterally based on facts it was either aware of, or did not care about, at the time the policies were sold.  Such *post hoc* underwriting is universally recognized as constituting insurance "bad faith."  Phoenix's reputation for engaging in this unlawful conduct has become widely known in the insurance industry and has even been discussed in the Wall Street Journal.

12.     By filing separate actions around the country seeking to rescind policies, Phoenix attempts to persuade courts that it was tricked into issuing the particular policy at issue, while hiding the vast scale of the policies Phoenix claims to have unknowingly issued.  But as set forth below, Phoenix was not tricked into doing anything.  The policies Phoenix now complains about

in its various rescission actions were in fact Phoenix's core business for years. Those policies were what enriched Phoenix's executives and sales force, and what made up the majority of Phoenix's business, and Phoenix cannot now claim with a straight face that it did not willingly, knowingly and happily issue policies it knew would potentially be sold to investors.

## THE PARTIES

13.     Plaintiff Wells Fargo is a national banking association with its main office located at 101 N. Phillips Avenue, Sioux Falls, South Dakota 57104 which appears solely in its capacity as the Trustee of the Milton Levy 2006-1 Insurance Trust. Wells Fargo conducts its activities as Trustee out of its office located at 750 N. Saint Paul, No. 1750, Dallas, Texas 75201.

14.     The Levy Trust is a common law trust created and organized pursuant to the laws of the State of Texas, with its principal place of business located at 750 N. Saint Paul, No. 1750, Dallas, Texas 75201. At the time the Policy was issued, the Levy Trust's principal place of business was located at 201 Main Street, Suite 301, Fort Worth, Tarrant County, Texas 76102. The Levy Trust was created for the purpose of owning and maintaining a life insurance policy on the life of Milton Levy.

15.     Upon information and belief, defendant PHL Variable Insurance Company ("Phoenix") is a corporation organized under the laws of the State of Connecticut, with its principal place of business located in Hartford, Connecticut. Phoenix is licensed to do business in the State of Texas. Upon information and belief, Phoenix is a wholly owned subsidiary of PM Holdings, Inc., which is a wholly owned subsidiary of Phoenix Life Insurance Company (when discussing the general business activities of "Phoenix," these claims refer to both defendant PHL Variable Insurance Company and Phoenix Life Insurance Company, collectively, as "Phoenix"). Phoenix Life Insurance Company is a wholly owned subsidiary of the Phoenix Companies, Inc., which became a publicly traded entity in 2001 and trades under the symbol "PNX."

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 based on the complete diversity of citizenship between Plaintiff and Defendant and because the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

17.     This Court has personal jurisdiction over the Defendant, as among other reasons, it has continuous and systematic contacts with Texas, and it contracted with the Levy Trust, organized and administered under Texas law, for the sale of life insurance, and issued the life insurance policy in Texas as a Texas policy, while intending to serve the life insurance market in Texas.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to the claims occurred in this District.  Among other things, Phoenix has billed premiums due under the Policy to the Levy Trust in this District and payment due under the Policy by Phoenix must be paid to the Levy Trust within this District.

## FACTUAL BACKGROUND

**A.**     **Life Insurance Sold to Investors and the Eager Participation of Phoenix in that Market**

19.     For decades, the life insurance industry has had to pay out relatively few death claims because the majority of life insurance policies lapse (*i.e.*, the policy owner ceases paying premiums) before the insured's death.  This occurs because, after owning a policy for some amount of time, most insureds find themselves in a position in which they are no longer able – or no longer desire – to continue to pay premiums.  Before the development of the "secondary market" for life insurance policies, such insureds were faced with little option and generally chose to surrender their insurance policy, thus relinquishing a potentially valuable asset for little or no payment from the insurer.  This state of affairs resulted in a tremendous windfall to

insurers, as they were able to retain premiums paid by all policy owners while only infrequently paying out death benefits.

20.     The secondary market for life insurance policies developed as a direct response to this imbalance of power between insurers and their insureds that resulted in most insureds surrendering their policies, and thereby abandoning months – or years – of premiums previously paid to the insurer.  Investors who purchase insurance policies from insureds in the secondary market provide the insureds with the option of selling their insurance policies to the investor rather than simply surrendering the policy to the insurer.  According to a recent GAO report, policy owners who sold their policies on the secondary market received approximately eight times the cash surrender value that they could have otherwise received from their insurers.  Although some insurers, as a scare tactic, have characterized this secondary market for life insurance policies as "wagering on human life", the secondary market provides an important service to insureds who are now able to sell a valuable asset (their paid-for insurance policy) rather than simply allowing the policy to lapse to the insurer's great benefit.

21.     The secondary market for life insurance not only benefits existing insureds, but also benefits potential insurance consumers.  Knowing that there are investors willing to purchase life insurance policies allows insureds to purchase insurance policies as a potential investment, as they can either keep the policy for long-term estate planning or elect to sell the policy to an investor.  Some states, such as Texas, also allow an insured to consent to a third party purchasing insurance on their lives directly from the insurer, thus, providing insureds with even greater flexibility as to how to utilize their "insurability."  The increased options provided by the secondary market encourage more people to utilize their insurability whether it be for long-term estate planning or to capitalize on it for more immediate financial gain.

22.     Although the secondary market for life insurance policies plainly benefits insureds, some life insurers have taken a negative view of the secondary market because of its perceived impact on historical life insurance policy lapse rates.  An investor who buys a policy on the secondary market or who purchases a policy directly from the insurer on an insured's life is unlikely to allow the policy to lapse.  Thus, when a policy is sold to an investor, the insurer is likely to have to pay the death benefit.  Insurers who dislike the secondary market dislike it because it ensures that they will have to do precisely what they promise in the insurance policies they issue – ultimately pay out insurance benefits for which they have received a premium.

23.     Upon information and belief, in or around 2004-2005, the life insurance industry began to experience significant growth in the marketing and sale of high face amount policies for high net worth elderly individuals.  Upon information and belief, this growth was largely attributable to the expansion in the secondary market for life insurance.  The knowledge that a policy could potentially be sold for a profit, rather than lapsed or surrendered to the insurance company, led many seniors to purchase policies as an investment that could potentially benefit their family if they decided they no longer wished to keep the policy.  That the increased demand for high face amount policies was driven by the secondary market was commented upon frequently within the insurance industry and was well known to all major life insurers.  That many insureds were forming trusts to own insurance policies on their lives, with the beneficial interests owned by investors or with the possibility that the beneficial interest would later be sold to investors, was also well known and frequently discussed in the insurance industry during this time.

24.     This increased demand for large face amount policies on the lives of seniors provided an opportunity for significant revenue for insurers wishing to sell such policies. Because such policies were unlikely to lapse, however, certain insurers determined that they did not believe such policies would ultimately be profitable and decided not to sell such policies.

Indeed, as early as 2005, certain life insurers had already developed pejorative terms, such as IOLI, to describe life insurance policies which they believed were being procured for the purpose of resale to investors.

25.    Other insurers, however, eager to obtain a share of the premium revenue from the increased demand for high face amount policies, actively embraced the secondary market and the transactions that led to this increased demand.  Phoenix was one of the companies which most eagerly embraced the new potential revenue available as a result of the secondary market.

**B.    Phoenix's Sale of (and Purchase of) Life Insurance Policies as an Investment**

26.    Upon information and belief, Phoenix was not concerned whether or not the policies it would issue were owned by investors or whether the policies were likely to be sold into the secondary market after issuance.  To the contrary, upon information and belief, because Phoenix wanted to increase its premium revenue, Phoenix actively solicited insurance agents and other producers to offer life insurance products that would be sold directly to third party owners or that were likely to be sold into the secondary market.  Phoenix was concerned only with generating as much premium revenue as possible through the sale of expensive life insurance policies on the lives of elderly individuals.

27.    Phoenix knew Texas explicitly permitted third parties to apply for and purchase insurance on the life of an insured provided that the insured so consents.  *See* Sections 1103.054 and 1103.056 of the Texas Insurance Code.  It also knew that Texas law precludes an insurer from challenging the validity of a policy on insurable interest grounds after it has issued the policy.  Nevertheless, Phoenix knowingly issued insurance policies to Texas entities on the lives of insureds from states other than Texas and did so under Texas law.  Specifically, when issuing policies to be owned by Texas residents (whether individuals, trusts, or otherwise), regardless of the state in which the insured resided, Phoenix used applications approved by the Texas

Department of Insurance and issued the policies on Texas policy forms approved by the Texas Department of Insurance.

28.     Upon information and belief, during the years prior to 2005, Phoenix's life insurance business had been on the decline.  Upon information and belief, Phoenix, in 2005, began a concerted effort to reverse this trend by attempting to become a leader in the sale of high face amount policies on the lives of elderly insureds, which would be owned by investors or were likely to be sold to investors.

29.     During the time period from 2005 to 2007, Phoenix engaged in an aggressive campaign to sell high face amount policies on the lives of elderly insureds in order to generate high premium revenue.  One former Phoenix employee, James Michael Max Labar, testified that although PNX's CEO sometimes made self-serving statements to shareholders that Phoenix was not selling so-called IOLI, "privately it was a different matter" as Phoenix's employees were told to "bring it on" and "crank it out."  Phoenix's regional sales managers encouraged employees to seek out so-called IOLI business from insurance agents, explaining "that's where you're going to make the money."  Employees who refused to participate in seeking out this business would either "fail," "leave" or "be fired."  Mr. Labar admitted under oath that approximately 80% of Phoenix's life insurance sales during the relevant time period were likely what Phoenix now calls IOLI and that this practice was so "blatant" that PNX's CEO and Phoenix's upper management would have had to have had a "learning disability" to not know that Phoenix's life insurance business was largely IOLI.

30.     Upon information and belief, as a result of Phoenix's embracement of the secondary market, its life insurance sales increased significantly in 2005.  Upon information and belief, Phoenix's sales of life insurance policies continued to expand dramatically into 2006, which Phoenix acknowledged was a direct result of it having accepted significant amounts of one

form of business which it now characterizes as IOLI: namely, non-recourse premium financing. The head of Phoenix's life insurance sales told employees that Phoenix's business philosophy with respect to policies sold pursuant to non-recourse premium financing was "the more the merrier." Phoenix even created a "user guide" related to non-recourse premium financing, which detailed different programs available so that its employees could best take advantage of this market.

31.      Even after many of its competitors denounced non-recourse premium financing as IOLI, Phoenix continued accepting such business and, even after deciding to stop accepting future non-recourse business, Phoenix "grandfathered" significant amounts of pending non-recourse business so as to be able to gain the significant premiums from the pending business and boost Phoenix's own financial position.  Although Phoenix ultimately ceased accepting non-recourse premium financing business, it continued to actively seek and accept other applications for policies which it believed were likely to be sold to investors.

32.      Phoenix's life insurance sales continued to increase dramatically in 2006 and 2007.  This increased business was directly tied to Phoenix's and its agents' heavy marketing and solicitation of business which Phoenix now claims was impermissible IOLI.  Upon information and belief, the majority of new premium revenue that Phoenix earned in 2005-2007 came from policies owned by investors, later sold to investors or owned by entities in which investors later purchased interests.  In several instances, Phoenix sold hundreds of millions of dollars of such policies through individual agents.  Phoenix sold many billions of dollars worth of policies it now characterizes as being IOLI.  In fact, Phoenix is currently involved in litigation over more than $3 billion worth of the policies it issued.

33.      One of Phoenix's former employees, Ed Humphrey, testified regarding this explosion in sales created by Phoenix actively and aggressively selling policies to investors or

policies destined to be sold on the secondary market.  Mr. Humphrey testified that he was

required to meet a $2 million quota for premiums generated in 2005.  Due to Phoenix's

marketing and solicitation of policies sold using non-recourse premium financing, Mr.

Humphrey was able to generate $7.5 million in premiums, nearly four times his $2 million quota.

According to Mr. Humphrey's testimony, policies sold using non-recourse premium financing

accounted for at least 90 percent of his business.  Phoenix raised Mr. Humphrey's quota to $8

million in premiums for 2006.  By continuing to bring in business which had all of the

"earmarks" of policies which were likely to be sold into the secondary market, Mr. Humphrey

alone generated *$36 million* in premium in 2006.  Mr. Humphrey's $36 million in premium was

more than the total premium generated by several top 100 life insurance companies.  Phoenix

raised Mr. Humphrey's premium quota to $20 million in 2007, which he met again.  As Mr.

Humphrey explained, the quotas set by Phoenix for its employees were impossible to meet

without selling policies intended to be sold in the secondary market (*i.e.*, policies Phoenix now

denounces as IOLI).  As Mr. Humphrey aptly put it, it "doesn't take a rocket scientist to figure

out what was happening" at Phoenix.

        34.     Upon information and belief, in order to support its sales efforts in the senior

market and maximize the issuance of high face value policies to seniors, Phoenix deliberately

relaxed and disregarded its underwriting standards and requirements, and pressured its

underwriters to approve policies, so that Phoenix could generate as much premium revenue as

possible.  Upon information and belief, Phoenix did not care about the accuracy of application

information submitted by its agents, or about obtaining additional information or follow-up,

because it was entirely indifferent to such information.  Rather, Phoenix cared only about

receiving premiums by having policies approved and issued.  This "anything goes" underwriting

philosophy by Phoenix extended not only to issues regarding the potential future sale of the

policy (which Phoenix encouraged), but also to issues related to potential insureds' financial and

medical status.  Indeed, Phoenix's "aggressive underwriting" was even commented on by financial analysts, who noted that Phoenix was likely approving policies its competitors would not in order to compensate for Phoenix's comparably low financial ratings.

35.     This consciously lax underwriting by Phoenix went hand-in-hand with its aggressive sales approach in the lucrative senior market.  An insurer who performs rigorous underwriting must reject a high percentage of applications and thus sacrifice short term profits for long term stability.  Phoenix had no interest in such an approach, as it cared only about generating significant premium revenue so that it could boost its short term profits, improve its financial ratings, and enrich its executives and sales force.  Its goal was to sell as many large policies as possible and thus deliberately relaxed, permissive, and inattentive underwriting was an essential part of that strategy.

36.     Phoenix's underwriters either did not care about whether or not the policies being issued by Phoenix were or would later be sold on the secondary market, or they succumbed to Phoenix's marketing pressure and disregarded such information.  Phoenix's underwriters disregarded potential "red flags" that might have caused other insurers, who did not wish to participate in the market, to decline policies.  On information and belief, Phoenix's underwriters were under tremendous internal pressure to approve large policies and risked reprimand and possible dismissal if they rejected a policy and thus cost Phoenix business or jeopardized their colleagues' bonuses and compensation.  The guiding philosophy and goal was to earn as much premium revenue as possible.  Phoenix's underwriters performed their jobs according to Phoenix's mission and strategy, approving policies regardless of any questions, concerns or red flags raised in the application file.

37.     Largely due to Phoenix's success in selling policies which it now derides as IOLI, PNX was able to pay significant dividends to its shareholders during the relevant timeframe.

Indeed, in each of the years from 2005-2007, it paid substantial dividends to its shareholders. During this timeframe, PNX's stock nearly tripled, climbing from a low of $6.55 in 2003 to a high of $16.05 in 2007.

38.     Phoenix's success in this market also enabled it to pay substantial bonuses to its executives and their sales force, and large commissions to its agents.  For example, Ed Humphrey testified that, due to the sale of policies which Phoenix now denounces as IOLI, his compensation rose from $75,000 in 2004 to $1.8 million in 2006.  Several other Phoenix employees received annual compensation in excess of $1 million during the relevant period due to the sale of policies likely to be sold into the secondary market.  Between 2003 and 2008, PNX's CEO Dona Young received approximately $25 million in executive compensation, which was far more than the compensation of CEOs from even larger insurance companies.

39.     Phoenix's participation in the secondary market for life insurance extended beyond actively promoting and soliciting life insurance policies which it either sold directly to third party owners or knew were likely to be sold to third parties on the secondary market. Indeed, its parent PNX became an active buyer and originator of policies on the secondary market.  On or about April 1, 2008, PNX issued a press release stating in relevant part:

> HARTFORD, Conn. – (BUSINESS Wire) – April 1, 2008 – The
> Phoenix Companies, Inc. (NYSE: PNX) today announced that
> through its subsidiary, Phoenix Life Solutions, it will enter the life
> insurance settlements business with a focus on customer value and
> full transparency on commissions and fees.
> Phoenix Life Solutions will work with four prominent brokerage
> general agencies (BGAs) across the country to originate life
> settlements, or purchase unwanted or unneeded life insurance

policies from policy owners in exchange for an immediate cash

settlement…

40.     Phoenix even included a "right of first refusal" in its policies to facilitate buying

its own policies on the secondary market.  Phoenix's assertions regarding "wagering," in the

various lawsuits it now files, are hypocritical.  Phoenix significantly and knowingly profited

from the secondary market during the years in which the sale of policies likely to be resold made

up the core of Phoenix's business.

C.     **Phoenix's Issuance of the Policy to the Levy Trust**

41.     On or about October 12, 2006, Milton Levy executed an Insured Consent Form in

which he agreed and acknowledged that:

> In accordance with and pursuant to Sections 1103.054 and 1103.056 of the
> Texas Insurance Code of 1951, as amended, I unconditionally and irrevocably
> consent to:
>
> (a)     the application for and purchase of one or more Policies on my life
> by the Trust; *provided, however* that the aggregate stated death benefit for
> such Policies (excluding stated death benefits, if any, under annuity contracts)
> shall not exceed $10,000,000 and
>
> (b)     the designation of the Trust as the exclusive beneficiary and owner
> of each of the Policies and any subsequent pledge or transfer of any ownership
> or beneficiary status of the Policies by the Trust.

(Emphasis in original).

42.     In accordance with the Insured Consent Form, on or about October 16, 2006,

Milton Levy established the Milton Levy 2006-1 Insurance Trust to purchase and maintain a life

insurance policy on his life.  Wells Fargo serves as the Trustee of the Levy Trust.

43.     On or about October 17, 2006, an application for the life insurance policy to be

issued to the Levy Trust was executed.  The Application was on a form approved by the Texas

Insurance Department and signified as such with "TX" notations throughout.  The Levy Trust

signed the Application in Texas.

44.     The application was signed by Wells Fargo, as trustee for the Levy Trust, by Milton Levy as the proposed insured, and by Phoenix's agent Kevin Burke who solicited the Policy on Phoenix's behalf.

45.     In the Application for the Policy to be issued to the Levy Trust, Milton Levy was listed as the "Proposed Insured."  The Levy Trust was listed as the Policy owner in the Application.  The Levy Trust was also explicitly listed as the only beneficiary of the Policy in the Application.  The Application disclosed that Mr. Levy resided in California, but that the Levy Trust was located in Texas.

46.     Phoenix did not ask for the beneficiary of the Levy Trust to be identified.  Nor did it require a copy of the trust agreement for the Levy Trust before issuing the Policy.

47.     In exchange for the agreement to pay premiums and other consideration, Phoenix subsequently issued and delivered, in Texas, Policy No. 97519119 dated October 27, 2006 to the Levy Trust.  The face amount of the Policy is $5,000,000.00.  The Levy Trust remains both the Policy owner and beneficiary.

48.     The Policy issued to the Levy Trust was on a form approved by the Texas Insurance Department and signified as such with "TX" notations throughout.

49.     The Policy was delivered to the Levy Trust in Texas, and acknowledged to have been received in Texas.

50.     All correspondence from Phoenix to the Levy Trust has been sent to Texas, along with all premium notices and annual statements.

51.     All premiums due under the Policy have been paid in accordance with the terms of the Policy and the Levy Trust has duly performed all other conditions of the Policy on its part. All premium notices were sent by Phoenix to the Levy Trust in Texas.

52.     The Policy provides that "If the Insured dies while the policy is in force, we will pay the Death Proceeds, as described below, within two months after our receipt of due proof of death of the Insured, subject to any applicable provisions of the policy."

**D.     Phoenix's Motivation for Failing to Honor The Policy And Engaging In Unfair and Bad Faith Claims Practices**

53.     Since issuing the Policy, Phoenix has found itself in substantially different economic conditions.  These changed conditions, and Phoenix's desire to avoid paying death benefits and thus further worsen its financial condition, and not any actual concern over the Policy's legitimacy, are the impetus for Phoenix's failure to pay the benefits owed to the Levy Trust under the Policy and for its improper handling of the claim submitted by the Levy Trust.

54.     Phoenix and its parent PNX suffered significant financial losses during the 2008-09 financial crisis.  They suffered a net loss of approximately $726 million in 2008; were downgraded by the ratings agencies to "junk" bond range; were forced to fire a substantial portion of their workforce; and lost their biggest distributors in early 2009 (because they were no longer able to sell Phoenix products).  PNX's stock, which had traded at over $15 a share during much of 2007 plummeted to as low as 21 cents a share in 2009.  Upon information and belief, PNX's reported losses were primarily attributable to poor investment and management decision by Phoenix's executives, as opposed to losses from the sale of life insurance products.  Indeed, AM Best had previously observed that "the company maintain[ed] higher than industry average exposure to commercial mortgage-backed securities, Alt-A residential mortgage-backed securities and below investment grade bonds as a result of its investment strategy."

55.     Because Phoenix is no longer attempting to sell large face value policies in the high net worth market, it apparently is no longer concerned with its reputation among distributors and consumers.  To address its financial concerns, Phoenix has made a concerted effort to avoid having to honor the policies it issued to investors or which its customers later sold

to investors.  Although Phoenix willingly issued such policies when it served its interests to increase premium revenue, Phoenix now views such policies as unprofitable because such policies are not likely to lapse and Phoenix will thus, as in this case, be presented with death claims.  Upon information and belief, Phoenix has concluded that if the policies it issued do not lapse, and Phoenix pays the death benefits when due, Phoenix's financial well-being will be threatened and Phoenix might become insolvent.  Phoenix has thus implemented a wide scale effort to avoid paying claims on the many billions of dollars worth of policies it issued which are owned by investors in the secondary market.

56.     As part of Phoenix's strategy to avoid paying death claims, in 2010 and again in 2011, Phoenix increased its COI rates for a block of policies it believed were likely to have been sold to investors.  In its 10-K, Phoenix specifically admitted that this increase in prices was being made due to its belief that many of the policies in the block were what Phoenix considers IOLI.  By increasing the COI charges, Phoenix hoped to make the policies unprofitable to investors and force them to lapse their policies.  The problem for Phoenix is that the terms of its policies do not permit cost of insurance increases except for specifically defined circumstances which do not include Phoenix wishing to punish investors for buying its policies.  Therefore, the New York Insurance Department ordered Phoenix to reverse its impermissible rate increases and multiple lawsuits, including a class action, have been filed against Phoenix regarding Phoenix's improper COI increases.

57.     Because Phoenix's policyholders have not acquiesced to Phoenix's unlawful COI increases, Phoenix has ramped up another part of its strategy for avoiding paying claims on policies sold to investors, which is to deny claims for coverage in instances in which the policy or an interest in the policy owner is owned by an investor, as being IOLI.  Upon information and belief, actually paying claims as promised in Phoenix's policies would present a significant strain on Phoenix's already dire financial situation.  Thus, apparently believing that desperate times

call for desperate measures, Phoenix has, on information and belief, decided to reject claims for payments on large face amount policies owned by third parties as a routine matter and to accuse such policies of violating insurable interest laws in the hopes that it can avoid having to meet its contractual obligations.  It has also engaged in an effort to rid itself of other large policies which it views as being unprofitable, and the substantial reserves required for such policies, by purporting to rescind such policies as IOLI.  To increase the windfall to itself, Phoenix takes the position that not only can it rescind policies years after they were issued but that it can also keep the premiums paid for the policies.

58.     In the various lawsuits Phoenix has filed seeking to void policies, it claims that the fact that the beneficial interest in the trust, or the policy itself, is owned by an investor means that the policy lacks a valid insurable interest.  By way of example, a partial list of lawsuits includes: *Alice Kramer v. Lockwood Pension Servs., Tall Tree Advisors Inc., Life Prods. Clearing LLC, Transam. Occidental Life Ins. Co., Phoenix Life Ins. Co., Lincoln Life & Annuity Co. of New York, and Jonathan Berck*, Case No. 08-CV-2429 (S.D.N.Y. May 29, 2008), Answer and Counterclaims; *Phoenix Life Insurance Co. v. The Irwin Levinson Insurance Trust II, and Jonathan Berck, as Successor Trustee*, Index No. 600985/2008 (N.Y. Sup. Ct. – N. Y. County); *PHL Variable Insurance Company v. U.S. Bank Nat'l Ass'n, et al.*, Case No. 10-cv-00197 (D. Minn. Apr. 8, 2010), Complaint; *PHL Variable Insurance Company v. 2008 Christa Joseph Irrevocable Trust*, Case No. 10-cv-03001 (D. Minn. Jul. 14, 2010), Complaint; *PHL Variable Insurance Company v. Jay Doss Irrevocable Life Insurance Trust*, Case No. HHD-CV-10-6017099-S (Conn. Superior Court, Hartford, November 23, 2010), Complaint; *PHL Variable Insurance Company v. Dolores C. Painter Irrevocable NJ Trust, et al.,* Case No. 10-cv-03603 (D.N.J. Jul. 16, 2010), Complaint; *PHL Variable Insurance Company v. LaSalle Bank N.A., et al,* Case No. 08-cv-11562 (E.D. Mich. Apr. 11, 2008), Complaint; *PHL Variable Insurance Company v. Clifton Wright Family Insurance Trust,* Case No. 09-C-2344 (S.D. Cal. Nov. 12,

2009), Complaint; *PHL Variable Insurance Company v. Kenneth Green Family Insurance Trust,* Case No. 09-cv-02606 (S.D. Cal. Nov. 18, 2009), Complaint; *PHL Variable Insurance Company v. The James Evans Family Insurance Trust,* Case No. 10-cv-00240 (S.D. Cal. Jan. 29, 2010), Complaint; *PHL Variable Insurance Company v. The Abrams Family Irrevocable Life Insurance Trust,* Case No. 10-CV-521 (S.D. Cal. March 11, 2010); *PHL Variable Insurance Company v. Kristian Giordano, et al.,* Case No. 10-cv-00661 (S.D. Cal. Mar. 26, 2010), Complaint; *PHL Variable Insurance Company v. Gabriel Giordano, et al.,* Case No. 10-cv-0071 (S.D. Cal. Apr. 13, 2010), Complaint; *PHL Variable Insurance Company v. The Hyman Davidson 2008 Irrevocable Life Insurance Trust,* Case No. 10-CV-1219 (S.D. Cal. June 8, 2010); Complaint; *PHL Variable Insurance Company v. The Patricia Sanford Family Insurance Trust, et al.,* Case No. 10-cv-00784 (S.D. Cal. Apr. 14, 2010), Complaint; *PHL Variable Insurance Company v. Alberto Rubio Family Insurance Trust, et al.,* Case No. 09-CV-4652 (C.D. Cal. June 26, 2009), Complaint; *U.S. Bank National Association v. PHL Variable Insurance Company*, Case No. 12-CV-0347, (C.D. Cal. Apr. 6, 2012); *U.S. Bank National Association v. PHL Variable Insurance Company*, Case No. 12-CV-00877, (D. Minn. Apr. 6, 2012).

59.    As a result of this widespread and systematic practice by Phoenix, sixty Phoenix policyholders recently brought claims against Phoenix for civil RICO, fraud, breach of contract, and declaratory relief related to the validity of their policies.  *Wilmington Savings Fund Society, FSB, as successor-in-interest to Christiana Bank & Trust Company, as trustee for John Doe Trust 1, et al. v. PHL Variable Insurance Company, et al.*, (Case No. 2:12-cv-04926-SVW-AJWx) (C.D. Cal. June 5, 2012).  Sixteen of the policies in that case were solicited on Phoenix's behalf by Kevin Burke, the same agent who solicited the Policy in this case.

60.    Additionally, as a result of this widespread and systematic practice by Phoenix, policyholders owning 179 policies worth $1.15 billion recently brought claims against Phoenix, its parent PNX, and various of Phoenix's current and former executives, for civil RICO and

violations of Connecticut's antitrust act and unfair trade practices act. *Lima LS Plc v. PHL Variable Insurance Company, et al.*, Case N0. 3:12-cv-01122 (D. Conn. August 2, 2012).

61.     Similarly, as a result of this widespread and systematic practice by Phoenix, thirteen Phoenix policyholders recently brought claims against Phoenix for breach of contract, fraud, and declaratory relief related to the validity of their policies. *See* Counterclaims in *PHL Variable Insurance Company v. ESF QIF Trust*, Case No. 12-CV-00319, (D. Del. Mar. 15, 2012) [D.I. 8].

62.     As this proliferation of lawsuits indicates, Phoenix has desperately avoided having to pay any large claims which would further weaken its final position.  In 2008, Phoenix had denied only 1% of the total death benefit claims it received (consistent with the industry average), but in 2009, 2010, and 2011 has denied 12.37%, 16.20%, and 20.87%, and is on track for an even higher percentage in 2012.

63.     Phoenix has instituted this widespread practice of denying claims without informing its policyholders or its regulators of its plans.  Indeed, Phoenix's regulators continue to require it to reserve for its policies as if it is a regular insurance company which will honor its claims.  Phoenix continues to comply with these reserve requirements so as to trick its regulators into believing, contrary to the facts, that Phoenix does not have any current plan to deny future claims.  In fact, Phoenix has already decided to deny coverage on billions of dollars worth of policies, yet continues charging and accepting premiums for such policies and pretending it is engaged in "business as usual" to its regulators.

64.     As a result of these efforts, PNX only lost $12.6 million in 2010 and turned a modest profit in 2011.  Had Phoenix honored its contractual obligations and paid death benefits when due, its financial slide undoubtedly would have continued.  These efforts have allowed Phoenix's key executives to enrich themselves to the detriment of Phoenix's policyholders.

65.     Phoenix's bad faith handling of the Levy Trust's claim for benefits and Phoenix's failure to honor the Policy are part of Phoenix's larger pattern of refusing to honor policies it knowingly sold and happily collected premiums for over many years.  Phoenix's conduct with respect to the Policy here is particularly egregious, however, because Texas law does not permit insurers to avoid paying claims based on a purported lack of insurable interest.

**E.     Phoenix Breaches The Policy And Engages In Unfair Settlement Practices and Bad Faith Claims Practices**

66.     Milton Levy died on May 16, 2012, more than five years after the Policy was issued.  Phoenix accepted premiums and even raised the charges for the Policy during that period.

67.     The Levy Trust, through its representatives, notified Phoenix of Mr. Levy's death on June 7, 2012.

68.     The Levy Trust, through its representatives, provided Phoenix with Mr. Levy's death certificate on June 20, 2012.

69.     Phoenix has not paid the Levy Trust the $5,000,000 owed under the Policy even though the Policy provides that Phoenix will make such payment within two months after receiving proof of the insured's death.

70.     The Levy Trust, through its representatives, repeatedly requested that Phoenix honor the Policy and promptly provide payment.  Specifically, on June 7, 12, 18 and 20, and again on July 2, 2012, the Levy Trust requested that it be provided with a claim form so that it could be promptly paid the $5,000,000 death benefit owed by Phoenix.  During this time period, Phoenix's representatives refused to allow the Levy Trust to speak with the person handling the claim and provided no legitimate excuse as to why it took over a month to provide the Levy Trust with the basic paperwork needed to process the claim.

71.     Upon information and belief, Phoenix had already decided that it would not honor the Policy before Mr. Levy died.  On information and belief, Phoenix has long had the Policy on its internal list of IOLI policies for which it planned to ultimately deny coverage and attempt to retain premiums.  Phoenix's agent for the Policy, Kevin Burke, has long been known to Phoenix as a so-called IOLI agent and Phoenix decided long ago that it would deny coverage for large policies solicited by Mr. Burke.  Indeed, at least 16 Phoenix policies sold by Mr. Burke are currently in litigation.

72.     When Phoenix finally responded to the Levy Trust, Phoenix demanded that the Levy Trust complete a Trust Certification, which is not required under the terms of the Policy.  By refusing to pay the Levy Trust's claim and insisting that the Levy Trust provide information not required under the Policy, Phoenix breached its obligations under the Policy and acted in bad faith.

73.     Phoenix's action in requiring the Trust Certification is part of its larger strategy to deny coverage on so-called IOLI policies.  Specifically, when a large death claim is submitted for payment by a trust, Phoenix refuses to promptly pay the claim after receiving due proof of death – which is all that is required by the terms of the policy for the death benefit to be paid.  Disregarding its contractual and legal obligations, Phoenix improperly and without any basis requires that the Trust Certification be completed.  In classic "Catch-22" fashion: (i) if the trust refuses to complete the form, Phoenix denies the claim; and (ii) if the trust completes the form, and indicates that the beneficiary of the trust is an "investor," Phoenix likewise denies the claim.  In short, if an investor is the beneficiary of the trust, Phoenix denies the claim on the purported (and erroneous) basis that the policy is what Phoenix considers to be a so-called IOLI policy and therefore, according to Phoenix, lacks a valid insurable interest.

74.     Any purported concern Phoenix has about the Policy being IOLI is irrelevant and disingenuous and does not excuse Phoenix's failure to promptly pay the Levy Trust's claim.  As an initial matter, Texas law does not permit insurers to avoid paying death claims based on a purported lack of insurable interest.  Moreover, even if Phoenix were entitled to raise insurable interest as an objection to paying claims, Phoenix has no good faith basis to contend that the Policy lacks a valid insurable interest under Texas law.  Texas law explicitly authorizes an insured to consent to *anyone* purchasing insurance on his or her life.  Specifically, Texas Insurance Code Section 1103.053 ("Insurable Interest of Beneficiary, Owner, Transferee, or Assignee") provides, in pertinent part, that:

> [A] beneficiary or owner of a life insurance policy who is designated in accordance with this subchapter or an entity to which a life insurance policy or an interest, benefit, right, or title in a life insurance policy is transferred or assigned in accordance with this subchapter has, at all times after the designation, an insurable interest in the life of the individual who is insured under the policy.

In addition, Texas Insurance Code Section 1103.056 ("Purchase of or Application for Policy by Third Party") provides:

> An individual of legal age may in a single written document:
>
> (1) consent to the purchase of or application for an individual or group life insurance policy by a third party; and
>
> (2) designate or consent to the designation of any individual, partnership, association, corporation, or other legal entity as:
>
> (A)  a beneficiary of the policy;
>
> (B)  an absolute or partial owner of the policy; or
>
> (C)  both a beneficiary and an absolute or partial owner of the policy.

75.     Milton Levy consented to the purchase of insurance on his life by the Levy Trust. Phoenix knows that based on the fact that Mr. Levy signed the application for the Policy.  The Levy Trust, therefore, has a valid insurable interest on his life under Texas law.

76.     Phoenix did not seek information about the Levy Trust in the Application or during the underwriting process for the Policy.  Phoenix did not ask what entities, if any, owned the Levy Trust or held beneficial interests in the Levy Trust.  Upon information and belief, Phoenix did not even request a copy of the Trust Agreement.

77.     Because Phoenix has no right under Texas law to refuse to pay a claim due to a purported lack of insurable interest, and because the Policy indisputably complied with Texas' insurable interest law, Phoenix has no legitimate basis to not pay the Levy Trust's claim for benefits under the Policy.  Phoenix has acted in bad faith in not paying the claim and in its handling of the claim.

78.     Phoenix's purported concern about IOLI is also disingenuous and hypocritical.  Upon information and belief, Phoenix actively and purposefully marketed, solicited, and encouraged the sale by its agents of life insurance policies for investment purposes and so-called IOLI to generate cash flow, premium income, and incentive compensation for Phoenix's senior officers.  These efforts were extremely successful.  Upon information and belief, during 2005-2007, the majority of business Phoenix received from its top agents consisted of what it now characterizes as being "IOLI."  This was no accident but rather a result of a concerted effort of Phoenix's sales force to boost revenue.

79.     Upon information and belief, Phoenix's failure to pay the Levy Trust the death claim owed under the Policy is not motivated by any genuine concern about IOLI.  Rather, on information and belief, Phoenix's sole motivation is to avoid paying a claim which will further weaken its already attenuated financial position.  Phoenix is acting purely in its own economic self-interest and in pursuing its own self-interest has violated the Texas Insurance Code and its contract with the Levy Trust.

80.     Phoenix, in failing to pay the $5,000,000 owed under the Policy to the Levy Trust, also engaged in unfair settlement practices proscribed by Sections 541.060(a)(2) and (a)(4) of the Texas Insurance Code.  Phoenix violated Section 541.060(a)(2) and (a)(4) of the Texas Insurance Code by wrongfully failing to pay the Levy Trust the $5,000,000 due under the Policy without a reasonable basis to do so, unreasonably delaying the claim process, misrepresenting the reasons for such delay, and refusing to pay the Levy Trust's claim unless it complies with conditions not required by the Policy.  Therefore, pursuant to Section 541.154 of the Texas Insurance Code, the Levy Trust hereby provides notice (and will also separately provide notice) that it intends to pursue claims against Phoenix, including for treble damages and fees, under Sections 541.060 and 541.151 of the Texas Insurance Code.  The Levy Trust will also be providing notice to certain of Phoenix's employees who are responsible for Phoenix's misconduct and whose actions are in violation of Section 541.060, that the Levy Trust intends to pursue claims against those individuals under Sections 541.060 and 541.151 of the Texas Insurance Code after sixty (60) days.

## COUNT I

## BREACH OF CONTRACT

81.     Plaintiff realleges and incorporates by reference each of the allegations made at paragraphs 1 through 80, inclusive.

82.     The Policy constitutes a valid and enforceable written contract between Phoenix and the Levy Trust.  The Levy Trust is the sole owner and beneficiary of the Policy.

83.     The Levy Trust has complied with all applicable conditions of the Policy including paying all premiums due under the Policy.

84.     Mr. Levy died on May 16, 2012 and Phoenix was provided with proof of Mr. Levy's death on June 20, 2012.  Therefore, Phoenix was obligated under the Policy to pay the $5,000,000 death benefit, plus interest, to the Levy Trust by August 20, 2012.

85.     Phoenix has breached its obligations under the Policy by failing to pay the Levy Trust the $5,000,000 death benefit due under the Policy, plus interest, as the Policy requires.

86.     Phoenix has further breached the Policy by refusing to pay the death benefit due under the Policy to the Levy Trust unless the Levy Trust complies with conditions not set forth in or required by the Policy.

87.     As a result of Phoenix's breach of the Policy, the Levy Trust has been damaged in an amount of $5,000,000, plus interest.

88.     Phoenix's wrongful conduct has forced the Levy Trust to retain the undersigned attorneys to prosecute its claim.  The Levy Trust has requested that Phoenix perform its obligations under the Policy, but Phoenix has refused.  The Levy Trust is therefore entitled to recover its reasonable and necessary attorneys' fees and expenses incurred in prosecuting this action under Section 38.001 of the Texas Civil Practices and Remedies Code.

## COUNT II

## DECLARATORY JUDGMENT

89.     Plaintiff realleges and incorporates by reference each of the allegations made at paragraphs 1 through 88, inclusive.

90.     The Policy constitutes a valid and enforceable written contract between Phoenix and the Levy Trust.  The Levy Trust is the sole owner and beneficiary of the Policy.

91.     The Levy Trust has complied with all applicable conditions of the Policy including paying all premiums due under the Policy.

92.     Mr. Levy died on May 16, 2012 and Phoenix was provided with proof of Mr. Levy's death on June 20, 2012.  Therefore, Phoenix was obligated under the Policy to pay the $5,000,000 death benefit, plus interest, to the Levy Trust by August 20, 2012.

93.     Phoenix has no legitimate basis for refusing to pay the death benefit to the Levy Trust.  Texas law precludes Phoenix from refusing to pay the Levy Trust's claim on insurable interest grounds, and the Policy, in any event, indisputably complied with Texas' insurable interest statute since Mr. Levy applied for the Policy and consented to the Levy Trust being the owner and beneficiary of the Policy.

94.     An actual controversy exists between the Levy Trust and Phoenix because Mr. Levy has died, a death certificate has been provided to Phoenix, but Phoenix has not paid the benefits due under the Policy to the Levy Trust.

95.     The Levy Trust desires a judicial determination of the respective rights, duties, and obligations of the parties and a declaration that Phoenix is obligated to pay the Levy Trust the $5,000,000, plus interest, due under the Policy.  Such a declaration is necessary and proper at this time in order that the parties may determine their rights and obligations among themselves, The Levy Trust further alleges pursuant to Section 37.010 of the Texas Civil Practice and Remedies Code that it would be equitable and just to award the Levy Trust its costs and reasonable and necessary attorneys' fees.

## COUNT III

## BREACH OF THE DUTY OF GOOD FAITH

96.     Plaintiff realleges and incorporates by reference each of the allegations made at paragraphs 1 through 95, inclusive.

97.     The Levy Trust and Phoenix have entered into an insurance contract which requires that the parties to the agreement deal with each other fairly and in good faith.

98.     The Levy Trust has complied with all applicable conditions of the Policy including timely payment of all premiums due under the Policy.

99.     Phoenix has accepted and retained all premiums paid for the Policy.

100.    Phoenix has failed to deal with the Levy Trust, the Policy Owner and Beneficiary, in good faith by wrongfully failing to pay the Policy's death benefit without a reasonable basis, refusing to pay the death benefit unless the Levy Trust complies with conditions not required by the Policy, by purposefully prolonging and delaying the claims process and misrepresenting the reason for such delay, and by engaging in a pretextual claims investigation when Phoenix had long ago internally determined that it will not honor the Policy.

101.    Phoenix has acted in bad faith and has engaged in malicious, intentional, fraudulent, and/or grossly negligent conduct that Phoenix knew would result in extraordinary harm.  The Levy Trust, therefore, is entitled to punitive and exemplary damages against Phoenix in an amount to be determined at trial.

102.    The Levy Trust has suffered damages due to Phoenix's breach of its duty of good faith in that it has been deprived of the insurance coverage for which it paid substantial premiums and is being forced to incur litigation expenses and costs in connection with enforcing the Policy and recovering the death benefit from Phoenix.

## COUNT IV

## CLAIM UNDER CHAPTER 542 OF THE TEXAS INSURANCE CODE

103.    Plaintiff realleges and incorporates by reference each of the allegations made at paragraphs 1 through 102, inclusive.

104.     On June 7, 2012, the Levy Trust notified Phoenix of Mr. Levy's death, thus providing it with notice of the Levy Trust's claim for benefits under the Policy.  On June 20, 2012, the Levy Trust provided Phoenix with Mr. Levy's death certificate.

105.     For weeks, the Levy Trust repeatedly requested that Phoenix honor the Policy and promptly provide payment.  Specifically, on June 7, 12, 18 and 20, and again on July 2, 2012, the Levy Trust requested that it be provided with a claim form so that it could be promptly paid the $5,000,000 death benefit owed by Phoenix.  During this time period, Phoenix's representatives refused to allow the Levy Trust to speak with the person handling the claim and provided no legitimate excuse as to why it took over a month to provide the Levy Trust with the basic paperwork needed to process the claim.

106.     Finally, on July 13, 2012, Phoenix provided the Levy Trust with claim forms and told the Levy Trust that it needed the Levy Trust's help to "begin the claim process."  One of the forms Phoenix belatedly provided to the Levy Trust, and required that it compete, was a "Certification And Acknowledgement of Trust Agreement," which is not required under the Policy, asks for information Phoenix did not ask for during the underwriting of the Policy, and which Phoenix routinely uses as a pretext for denying claims.

107.     Pursuant to Section 542.055 of the Texas Insurance Code, Phoenix was required to commence any claim investigation immediately, and within 15 days of being notified of the Levy Trust's claim, request all statements and the completion of all forms which it reasonably believed to be necessary in order to process the Levy Trust's claim.  In direct violation of this statute, Phoenix did not provide claim forms or commence its investigation into the claim until over a month after being notified of the Levy Trust's claim under the Policy.

108.     Because of Phoenix's violation of Section 542.055 of the Texas Insurance Code, Phoenix is required, pursuant to Section 542.060 of the Texas Insurance Code, to pay the Levy

Trust statutory damages in the amount of 18% annual interest on the death benefit owed to the Levy Trust continuing through the date of payment or judgment, whichever is earlier.

109.    As a result of Phoenix's violations of Chapter 542, the Levy Trust was forced to retain counsel to prosecute the Levy Trust's claims.  The Levy Trust therefore seeks to recover its reasonable attorneys' fees as permitted by Section 542.060(b) of the Texas Insurance Code.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enters judgment ordering as follows:

110.    Declaring that Phoenix is obligated to pay the $5,000,000 due under the Policy, plus interest, to the Levy Trust;

111.    Awarding the Levy Trust damages for breach of contract in an amount not less than $5,000,000, plus interest and other consequential damages;

112.    Awarding the Levy Trust compensatory, punitive, and exemplary damages due to Phoenix's breach of the duty of good faith;

113.    Awarding the Levy Trust statutory damages under Chapter 542 of the Texas Insurance Code, including interest at the statutory rate of 18 percent per annum and attorneys' fees;

114.    Granting the Levy Trust its costs of suit, expenses, and reasonable attorneys' fees;

115.    Granting the Levy Trust pre and post-judgment interest on the foregoing sums; and

116.    Granting the Levy Trust such other and further relief as the Court deems just and appropriate.

Dated:  September 17, 2012                    Respectfully submitted,


                                             /s/ Philip A. Vickers
*Of Counsel (pro hac vice admission pending):*   RALPH H. DUGGINS
JOHN E. FAILLA                               State Bar No. 06183700
jfailla@proskauer.com                        rduggins@canteyhanger.com
ELISE YABLONSKI                              SCOTT A. FREDRICKS
eyablonski@proskauer.com                     State Bar No. 24012657
NATHAN LANDER                                sfredricks@canteyhanger.com
nlander@proskauer.com                        PHILIP A. VICKERS
PROSKAUER ROSE LLP                           State Bar No. 24051699
Eleven Times Square                          pvickers@canteyhanger.com
New York, New York 10036                     CANTEY HANGER LLP
(212) 969-3000                               600 West 6th Street, Suite 300
(212) 969-2900 – Fax                         Fort Worth, TX  76102
*Attorneys for the Milton Levy 2006-1*       (817) 877-2800
*Insurance Trust  through Wells Fargo Bank,* (817) 877-2807 – Fax
*N.A. as its Trustee*

NANCY SHER COHEN                             ATTORNEYS FOR PLAINTIFF
ncohen@proskauer.com
JOSHUA J. POLLACK
jpollack@proskauer.com
PROSKAUER ROSE LLP
2049 Century Park East
Los Angeles, CA  90067-3206
(310) 557-2900
(310) 557-2193 – Fax